UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CANADA JETLINES LTD. and : 
CANADA JETLINES OPERATIONS LTD. :
 :
                     Plaintiffs, : **COMPLAINT**
 : (Jury Trial Demanded)
  - against – :
 :
DAVID NEELEMAN, DGN CORPORATION :
and BREEZE AVIATION GROUP, INC., :
 :
                     Defendants. :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiffs Canada Jetlines Ltd. and Canada Jetlines Operations Ltd. (together, "Plaintiffs" or "Jetlines"), by their undersigned attorneys, allege as follows for their Complaint herein:

1. This is an action for tortious interference with business expectancy and violation of the Connecticut Unfair Trade Practices Act (CUTPA), C.G.S.A § 42-110a et seq. In July and August 2018, Defendants David Neeleman ("Neeleman"), DGN Corporation ("DGN") and Breeze Aviation Group, Inc. (together, "Defendants"), embarked upon a predatory scheme to destroy the relationships between Jetlines, on one hand, and Jetlines' CEO and a leading international investment bank (the "Bank"), on the other hand, with the purpose and ultimate effects of (i) causing the Bank to terminate its engagement to assist Jetlines in raising the new investment capital that was and is essential to Jetlines' ability to commence operations as an ultra low-cost passenger air carrier ("ULCC") in Canada, and (ii) causing related financial and operational damage to Jetlines.

2. During that time, Defendants deliberately induced Jetlines' Chief Executive Officer, Lukas Johnson ("Johnson"), to participate in a series of secret communications and meetings that Neeleman knew to be in breach of Johnson's contractual and fiduciary duties to

Jetlines, including but not limited to Johnson's duties of loyalty, candor and full-time attention to his responsibilities as Jetlines' CEO.

3. During those communications and meetings, which the participants kept secret from Jetlines through, among other things, a nondisclosure agreement that Defendants induced Johnsons to sign in late July 2018, Neeleman sought to lure Johnson away from Jetlines and otherwise to obtain his services and advice concerning Neeleman's own new airline venture, code-named Moxy, which was owned and to be operated by Defendant Breeze Aviation Group, Inc. ("Moxy"). Neeleman is a founder and principal of Moxy. Neeleman knew that Jetlines was relying heavily on Johnson as its principal representative in its financing efforts with the Bank and that Johnson, as Jetlines' CEO, would become indispensable to those efforts as they approached the imminent date upon which the Bank and Jetlines would begin their presentations to prospective investors.

4. Defendants conspired with Johnson to mislead Jetlines and the Bank into believing that Johnson was fully committed to Jetlines' future and to seeing its financing effort and operational launch through to their conclusion, even as Defendants were working secretly with Johnson to engineer his departure at the point in time most likely to injure Jetlines. Neeleman's overriding purpose in that deception was to derail Jetlines' relationship with the Bank and thereby to delay and hinder Jetlines from obtaining new financing and commencing operations as a Canadian ULCC. In that, he succeeded.

5. Late in the evening of August 27, 2018, as Jetlines and the Bank were poised to launch their critical presentations to prospective investors, in which Johnson was to play a central role and which were structured to emphasize his standing in the industry and his importance as Jetlines' CEO, Johnson stunned Jetlines by announcing without prior warning that he would be

resigning in order to work for Neeleman's new venture, Moxy. Almost immediately thereafter, and before Jetlines itself could respond to the event that Neeleman had secretly orchestrated over the course of at least the preceding month, Neeleman telephoned the Bank's Managing Director in charge of the Jetlines project and announced that he, Neeleman, had hired away Jetlines' CEO. Neeleman had no other legitimate purpose for making that call at that time.

6. As Neeleman maliciously intended, his surprise announcement caused the Bank immediately to suspend its efforts to procure new financing for Jetlines. The Bank advised Jetlines at the time that Johnson's departure was a huge blow to the company, that the Bank was uncertain Jetlines could recover from it, and that the Bank would be unable even to consider marketing the company again for many months, if at all. Some three months after going "pens down" in this fashion, the Bank notified Jetlines in writing that its engagement was terminated, effective December 8, 2018.

7. Neeleman's intentional interference with Jetlines' relationships with Johnson and the Bank has caused substantial damage to Jetlines. Among other things, Jetlines' reputation in the airline and financial industries, and with prospective investors, was injured; Jetlines' ability to obtain crucial financing commence flight operations and earn related revenues was delayed; Jetlines' lease agreement for certain aircraft was terminated, causing it to lose USD $2.2 million in non-refundable deposits; and the amount of financing available to Jetlines was significantly reduced.

**I. JURISDICTION AND VENUE.**

8. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332(a)(2) and (a)(1). There is complete diversity of citizenship between the parties. The amount in controversy exceeds $75,000 USD.

9. Plaintiffs are citizens of Canada, having both been incorporated in British Columbia

and having their principal place of business in Vancouver, British Columbia, Canada.

10. Upon information and belief, Defendant Neeleman is a citizen of the State of Connecticut. Plaintiffs' causes of action arise from tortious acts Neeleman committed in Connecticut.

11. Upon information and belief, Defendant Moxy is a corporation organized and existing under the laws of Delaware and having its principal place of business in Connecticut. Plaintiff's claims against Moxy arise from tortious acts it committed in Connecticut.

12. Upon information and belief, Defendant DGN is a corporation organized and existing under the laws of the State of Utah and having its principal place of business in the State of Connecticut.

13. Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b)(1) and (2), because Defendants are residents of the State of Connecticut, and a substantial part of the events or omissions giving rise to Plaintiffs' claims against Defendants occurred in Connecticut.

## II. BACKGROUND REGARDING JETLINES, THE BANK, JOHNSON.

### A. Jetlines

14. Plaintiff Canada Jetlines Ltd. was incorporated under the laws of British Columbia, Canada, and continued as a Canadian Federal corporation pursuant to the Canada Business Corporations Act effective February 27, 2017. Its shares are publicly traded on the Canadian TSX Venture Exchange under the symbol JET. Jetlines' principal business is the start-up of a ULCC scheduled airline service in Canada, through its wholly-owned subsidiary, Plaintiff Jetlines Canada Operations Ltd., which was incorporated under the laws of British Columbia, Canada.

15. Jetlines' business plan calls for it to provide greater service and lower fares among a network of routes to be established between regional airports within Canada and to select destinations in the US, Mexico and the Caribbean.

16. Toward that end, on or about June 22, 2018, Jetlines signed definitive lease agreements with AerCap for two Airbus A320 aircraft. Delivery of those initial aircraft was scheduled to occur in March and April 2019, and Jetlines commencement of flight operations in Canada was expected to commence before the end of June 2019. Jetlines planned to acquire additional aircraft thereafter, toward a fleet eventually numbering 50 or more. However, Jetlines' launch of airline operations was and remains subject to completion of a financing to raise funds necessary to commence the build-out of the airline with aircraft, personnel, training, inventory, deposits, sales and administrative systems and other launch activities.

17. The raising of new funds was and is necessary not only for build-out purposes, but to obtain the necessary Canadian governmental licenses to operate an airline. Those are, first, an Air Operating Certificate ("AOC") from Transport Canada, and second, a large-aircraft "705 license" from the Canadian Transport Agency. Both require that Jetlines have secured tens of millions of dollars in financing, beyond that which Jetlines possessed in June 2018 or possesses now.

18. Failure to obtain new financing in a timely manner, arising from Defendants' malicious inducement of Johnson's resignation, has delayed Jetlines' ability to execute its build-out strategy, obtain necessary licenses, commence operations, and earn related revenues.

**B.  Jetlines' Engagement of the Bank and Early Financing Activities.**

19. By letter agreement dated January 5, 2018 (the "Financing Agreement"), Jetlines engaged the Bank as its exclusive agent to arrange a private placement of Jetlines' equity or equity-linked securities compliant with US and Canadian securities laws. The Bank is a highly regarded international investment bank that presents itself as offering comprehensive financial advisory, capital raising, financing and risk management services for corporations, governments and financial institutions worldwide.

20. Pursuant to the Financing Agreement, the Bank agreed to perform the following services, among others, for Jetlines:

    (a)    Familiarizing itself with the financial position and operations of the Company [Jetlines] and the industry in which it operates;

    (b)    Advising and assisting the Company as to the form and structure of the proposed Securities offering;

    (c)    Assisting the Company in negotiating documentation with potential investors;

    (d)    Assisting the Company with preparing marketing materials to be used with Securities offering;

    (e)    Assisting the Company with negotiating final sizing, order allocation and pricing of the transaction; and

    (f)    Carry out such other duties as the Company and [the Bank] agree are appropriate in the circumstances.

21. Between approximately January and May 2018, the Bank was primarily occupied under the Financing Agreement with providing the services described in subparagraphs 15(a) and (b) above. During that time Jetlines, in consultation with the Bank, devoted substantial resources to identifying and engaging a new Chief Executive Officer who would provide the airline industry expertise and credibility necessary to spearhead its financing efforts with the Bank and oversee its transition to an operating airline.

22. Jetlines' efforts bore fruit in late May 2018, when it agreed, with the Bank's approval, to engage Lukas Johnson as Jetlines' new CEO. Jetlines announced that hiring on May 22, 2018 and executed a written employment agreement with Johnson on or about June 8, 2018 (the "Johnson Employment Agreement"). Johnson commenced his duties at Jetlines on or about June 18, 2018.

**C.    Johnson.**

23. Johnson is, upon information and belief, a citizen of the United States. At the time

of his hiring by Jetlines, Johnson was a resident of Las Vegas, Nevada. Upon information and belief, Johnson may have subsequently changed his residence to the State of Colorado. Johnson is not currently a party to this action.

24. Immediately prior to joining Jetlines, Johnson had held a succession of senior positions at Allegiant Travel Company ("Allegiant"), which was a leading ULCC in the United States. Johnson had most recently been Allegiant's Senior Vice President, Commercial. During his eight-year tenure at Allegiant, Johnson acquired extensive expertise in airline network planning, revenue management, operations research, corporate strategy, e-commerce and operations. Under his leadership, Allegiant developed the fastest expanding network in North America, which grew to over 400 routes and 12 airports served; it increased annual revenue per plane by more than 30% and grew to total operating revenues to $1.5 billion.

25. Johnson was highly regarded in the airline industry and in the airline capital markets on Wall Street. He had been Allegiant's main spokesperson on investor communications, including press interviews, analyst calls and company press releases, and was frequently featured and quoted in the financial and airline press. The Bank concurred that Johnson was well respected and would be "bankable" as Jetlines' CEO.

26. Johnson was thus well-suited to become the CEO of Jetlines and the face of the airline for purposes of promoting its financing efforts in conjunction with the Bank, and of launching its operations as Canada's first true ULCC. As Johnson stated in connection with Jetlines' May 2018 announcement of his hiring, "I'm excited to join Jetlines at this *pivotal point* in the Company's history."

### 1. Johnson's Duties to Jetlines.

27. Paragraph 3.5 of the Johnson Employment required Johnson, among other things, to "devote his full time, effort, care and attention to his duties set out in this Agreement and to the

business of the Company." The same paragraph provided further: "Prior to engaging in any other work not related to the Company, the Employee must obtain written authorization from the Executive Chairman who will inform the Board of any such authorizations."

28. In Paragraph 3.6 of the Johnson Employment Agreement, Johnson acknowledged and agreed that, among other things, "as an executive of the Company and as an officer of the Company, [Johnson] occupies a position of fiduciary trust and confidence, and as a fiduciary, will develop and acquire wide experience and knowledge with respect to all aspects in which the Company's business is conducted . . . ." The same paragraph provided further: "Without limiting the generality of the foregoing, [Johnson] must observe the highest standards of loyalty, good faith, and avoidance of conflicts of duty and self-interest."

29. Paragraph 7.3 of the Johnson Employment Agreement provides as follows: "The Employee agrees to maintain securely and hold in strict confidence all Confidential Information received, acquired or developed by the Employee or disclosed to the Employee as a result of or in connection with the Employee's employment with the Company. The Employee agrees that, both during the Employee's employment with the Company and after the termination of the employment with the Company, the Employee will not, directly or indirectly, divulge, communicate, use, copy or disclose or permit others to use, copy or disclose, any Confidential Information to any person, except as such disclosure or use is required to perform the Employee's duties hereunder or as may be consented to by prior written authorization of the Company."

30. Under Canadian statutory and common law, which governs the relationship between Johnson and Jetlines, and as acknowledged by Johnson in the Johnson Employment Agreement, Johnson owed Jetlines fiduciary duties during his tenure as CEO, and was required to discharge his obligations under the Johnson Employment Agreement honestly and in good faith.

Among other things, those duties included obligations of loyalty and candor that prohibited Johnson from exploiting his position within Jetlines for his own personal benefit, prohibited him from hindering the ability of Jetlines to continue the business for which it was developed, required him to disclose any conflict of interest under which he may have been acting, and prohibited him from deceiving or otherwise being dishonest in his relationship with Jetlines.

31. Concurrently with execution of the Johnson Employment Agreement on or about June 8, 2018, Johnson executed a Subscription Agreement with Jetlines (the "Subscription Agreement"), pursuant to which Johnson agreed to purchase 800,000 Class B Common Shares of Jetlines for a total cash price of $700,000 (the "Johnson Stock Purchase"). This transaction did not close at that time, but was to be effectuated by the parties' prompt execution of certain ancillary closing documents.

2. **Johnson's Involvement in, and Importance to, Jetlines' Financing Efforts with the Bank.**

32. Immediately upon assuming his duties as Jetlines' CEO, Johnson took the lead in working with the Bank to identify likely investors in a prospective a private placement of Jetlines' securities and to prepare investor presentations containing confidential information concerning, among other things, Jetlines, its financial and business information and plans, and its market analyses. Immediately after hiring Johnson, Jetlines presented him to the Bank as the new face of the airline.

33. Both Jetlines and the Bank regarded Johnson as indispensable to Jetlines' financing efforts. Before hiring Johnson, Jetlines cleared the hire with the Bank, which confirmed it could complete the financing if Johnson were Jetlines' CEO. Thereafter, throughout July and August 2018, as Johnson knew, Jetlines and the Bank contemplated that Johnson would be Jetlines' principal representative in presentations to prospective investors, and they proceeded with their

preparations on that basis.

34. Among other things, Johnson participated with the Bank as early as early July and continuing into late August 2018 in preparing draft investor presentations that touted his leadership of Jetlines and his experience and success in the low-cost airline carrier field. Johnson took the lead on Jetlines' behalf in working with the Bank to prepare detailed financial and operating models and related summaries, for Johnson and the Bank to present to prospective investors, who would be required to sign nondisclosure agreements ("NDAs") in order to review the confidential Jetlines information set forth therein.

35. As late as August 27, 2018, the financial model and related investor presentations being finalized by Jetlines and the Bank projected net financing proceeds of $100 million Canadian, or nearly $80 million USD. The then-current investor presentation continued to proclaim that "Jetlines is led by Lukas Johnson, former SVP, Commercial at Allegiant Travel Company." By that time, Jetlines Chairman Mark Morabito ("Morabito") had advised Jetlines' Board of Directors that Jetlines and the Bank would be "launching our financing efforts imminently," and the parties were planning to meet at the Bank's offices on September 6, 2018 to conduct a "dry run" of their meetings with prospective investors.

36. The timeline then in place between Jetlines and the Bank projected, among other things, that investor presentations would conclude by the end of September 2018, fund-raising would be completed by the end of December 2018, and flight operations would commence in June 2019. As Johnson and Neeleman knew, Jetlines' financial model and business plan at the time depended on the delivery of aircraft under the AerCap lease in time to commence operations for the peak summer season. And that lease was subject to certain financing contingencies that could not be met if the Bank withdrew its support.

37. In June and July 2018, Johnson participated with others at Jetlines and the Bank in identifying potential lead investors that the Bank would use in launching its financing efforts for Jetlines. Those efforts produced an "initial approach" list, which was in place by August 21, 2018, and which included three introductions procured by Johnson, along with twelve other prospective investors, including Defendant Neeleman and his operating entity DGN. Johnson had been aware since early July 2018 that Neeleman was among the prospective investors in Jetlines. In his electronic notes of an evident July 3, 2018 call or meeting between Jetlines and Bank personnel concerning their efforts to line up "seasoned airline investors," Johnson listed several names, including "David Neelemen" [sic], that ended up with others on the August 21 "initial approach" list. Johnson noted that Neeleman was "doing Moxy, familiar with Canada, could be a name." It is now apparent, of course, that Neeleman had deployed, or was about to deploy, his plan to use Johnson as a tool, whether unwitting or otherwise, with which to damage Jetlines, his and Moxy's potential future competitor.

### III. DEFENDANTS NEELEMAN DGN AND "MOXY."

38. As Johnson wrote in his notes, Neeleman was indeed "familiar with Canada," having been a co-founder of WestJet in or around 1996. Today, WestJet is one of Canada's two largest airlines, having started as a low-cost carrier and later transitioning into a full-service airline.

39. In or around 1989, before helping to found WestJet, Neeleman had co-founded an airline called Morris Air. He became its president in 1989. Morris Air was sold to Southwest Airlines in 1993 for $130 million. It has been publicly reported that Neeleman received $25 million from that sale.

40. In or around, 1999, Neeleman founded JetBlue. He served as CEO of JetBlue until approximately 2007 and as its non-executive Chairman until approximately 2008. JetBlue's business model was that of a low-fare airline that also offered certain upscale amenities.

41. In or around 2008, Neeleman launched a Brazilian airline called Azul. It has been characterized as a Brazilian copy of JetBlue, offering lower fares but greater comforts than do conventional airlines. Azul is reportedly the third largest air carrier in South America. Neeleman reportedly stepped down as Azul's CEO in 2017, but remains Chairman of its board.

42. In June 2018 it was reported in the airline press that Neeleman had, along with others including Robert Milton, Michael Lazarus and Henri Coupron, formed a company to launch a new low-cost airline. The company is Breeze Aviation Group, a defendant herein, and the airline's tentative working name is Moxy. Moxy was reported to have raised initial funding of $100 million USD, and to have purchased 60 new Airbus A220 aircraft for delivery beginning in 2020, to provide nonstop service to secondary airports located near major metropolitan areas, such as Providence (Rhode Island) near Boston, Stewart Airport north of New York City, and Gary (Indiana) near Chicago. In an article published in October 2018, Neeleman was quoted as claiming that the new airline will eventually fly hundreds of routes within the US and from the US to Europe and South America.

## IV. DEFENDANTS' INTENTIONAL AND TORTIOUS INTERFERENCE WITH JETLINES' RELATIONSHIPS WITH JOHNSON AND THE BANK.

43. The facts alleged in ¶¶ 1-42 to follow are shown in significant part by listings of emails sent and received by Johnson through his personal Gmail account, which were stored on a laptop computer owned by Jetlines and assigned to Johnson. Jetlines obtained screen shots by means of its forensic examination of that computer following Johnson's announcement of his resignation from Jetlines.

44. Beginning no later than July 27, 2018, and knowing full well of Johnson's position with Jetlines and of his corresponding fiduciary and contractual duties of, among other things, loyalty, candor and full-time attention to Jetlines, Defendants Neeleman and other individuals

affiliated with Moxy, acting through and in concert with Defendant DGN, and using DGN's facilities including their email addresses at dgncorp.com, induced Johnson to embark on a course of conduct in egregious breach of those duties and knowingly participated with him in those breaches.

45. On or about Friday, July 27, 2018, at Neeleman's invitation and as arranged by Neeleman's assistant Carol Archer, Johnson took the "red-eye" flight from Vancouver (YVR) Airport to JFK Airport in New York City, to travel on from there to Norwalk, Connecticut, for dinner the following day with Neeleman and possibly other Moxy personnel and for secret discussions concerning Moxy's business and ways in which Johnson could assist it.

46. Before that meeting and those discussions occurred, Moxy's officer Kyle Smith forwarded via email a *nondisclosure agreement* between Moxy and Johnson, for Johnson to execute and return, which Johnson did via his personal Gmail account. Evidently in obedience to his new contractual obligations to Moxy under that NDA – which conflicted with his fiduciary and contractual duties to Jetlines – Johnson did not at any subsequent time disclose to Jetlines the existence of the NDA nor the fact and/or substance of his travel to Connecticut for covert discussions with Neeleman and Moxy.

47. If Johnson, Neeleman and Moxy had disclosed to Jetlines, in late July 2018, the existence and nature of their discussions, as Johnson's duties of loyalty, candor and full attention required, then Jetlines could have preempted further discussions between Johnson and Neeleman/Moxy or, alternatively, could have timely replaced Johnson as Jetlines' principal representative in its financing efforts and thereby preserved its relationship with the Bank.

48. Instead, Neeleman/Moxy were able to continue their surreptitious communications and meetings with Johnson from late July through the night of August 27, 2018, when Johnson

orally advised Morabito that he would be resigning to go to work for Neeleman and Moxy. During that interval, not only did Neeleman and Moxy continue to suborn Johnson's rendition of illicit services to their nascent airline venture but, pursuant to the scheme orchestrated by Neeleman and Moxy, but Johnson continued with their knowledge and on their behalf to mislead Jetlines into believing that he would be instrumental to Jetlines' financing and operational efforts for the foreseeable future.

49. For example, immediately after meeting with Johnson on July 28, Neeleman and others at Moxy and/or DGN corresponded with Johnson regarding the economics and interior configurations of the Airbus aircraft to be purchased and operated by Moxy. On August 5, 2018, they provided Johnson with electronic access to Moxy's files, one of which, an Excel spreadsheet Johnson saved on his Jetlines-issued computer, contained detailed information concerning, among other things, the expected performance, economics, revenue model and investment analysis of "Project Moxy" aircraft, and obtained his input regarding their plans. On August 11-12, they conducted "All Hands" meetings with Johnson and others including Tom Doxey and Chris Golden, in Connecticut, with Johnson spending the night of August 11 at Neeleman's Connecticut home. During those meetings, they solicited and obtained Johnson's input concerning Moxy's business plans and, it appears, attempted to induce him to leave Jetlines and become employed by Moxy.

50. On or about August 20 or 21, 2018, Neeleman transmitted, via his DGN email account, an offer of employment to Johnson. Promptly thereafter, Johnson responded by email with his comments. On August 24, 2018, Neeleman responded to Johnson by email that [e]verything looks reasonable," and undertook to forward a proposed employment agreement with Moxy and/or DGN. Drafts of the employment and a related side letter were exchanged between Neeleman and Johnson on August 26 and 27 and presumably executed by Johnson on August 27,

2018.

51. The timing of these meetings and the engagement of Johnson was no accident. During the period late July through late August 2018, Neeleman knew that Jetlines' and the Bank were poised imminently to launch Jetlines' financing campaign, knew the crucial importance of new financing to Jetlines' ability to commence operations, and knew the leading role of Johnson in those efforts and in Jetlines' relationship with the Bank. Among other things, Neeleman had been advised by Johnson and others at Jetlines and/or the Bank of Jetlines' interest in having him invest. Neeleman knew that luring Johnson away from Jetlines at that critical moment would damage if not destroy Jetlines' relationship with the Bank, and would injure if not cripple Jetlines' ability to enter the North American ULCC space with a business model similar to that of Moxy.

52. For those very reasons, Neeleman induced Johnson to continue concealing (pursuant to the Moxy NDA and otherwise) his communications and dealings with Neeleman and Moxy, and to continue misleading Jetlines and the Bank regarding his intentions to follow through with Jetlines' financing and commencement of operations. Among other things, throughout August 2018, at the very same time that he was having business meetings and negotiating an employment agreement with Neeleman and Moxy, up to and including August 27, and at the direction and with the knowledge of Neeleman, Johnson pretended to be working with Jetlines to finalize and close the stock purchase component of his Jetlines employment agreement. Accordingly, as Neeleman and Johnson intended, Jetlines was completely blindsided when, at approximately 8:30 p.m. PST on August 27, 2018, Johnson called and advised Morabito that he would be leaving Jetlines to work for Neeleman.

53. Jetlines immediately scrambled to convince Johnson to stay or, alternatively, to formulate a strategy to adjust to his sudden departure and preserve its financing relationship with

the Bank. But before Jetlines could begin to recover, Neeleman made sure that it would be unable to do so. Within about 48 hours after hiring away Jetlines' CEO, Neeleman called the head of the transportation finance team at the Bank to gloat over having done so. In substance, Neeleman advised the Bank that he was not interested in the Jetlines deal that the Bank was shopping around, as he had just hired Jetlines' CEO.

54. Neeleman's call was, as he intended, the death knell for the Bank's participation in Jetlines' financing efforts. Immediately after that call, the Bank suspended work on the Jetlines project. By letter dated November 28, 2018, following a three-month period during which Jetlines scrambled to reset its management team and seek financing without the Bank's assistance, the Bank formally notified Jetlines that it was terminating its Financing Agreement, effective December 8, 2018.

55. Other than to disrupt, delay and possibly destroy Jetlines' efforts to obtain new financing and commence flight operations, there was no compelling reason for Neeleman and Moxy to suborn Johnson's disloyalty and resignation, much to interfere directly with Jetlines' relationship with the Bank, at that critical time in Jetlines development. Among other things, Moxy had no need for Johnson's services in the late summer of 2018. Moxy was not scheduled to commence its own flight operations for another two or more years. Johnson stayed on with Jetlines for more than two months following his August 27, 2018 notice of resignation. Perhaps most tellingly, it was not until December 19, 2018, almost four months after Neeleman's private announcement to the Bank, that Neeleman saw fit to make a public announcement that he had hired Johnson "to lead commercial strategy for his new U.S. airline, which could begin flying *as soon as 2021*." (emphasis added)

## V. DAMAGE TO JETLINES.

56. Defendants' interference with Jetlines' relationships with Johnson and the Bank

caused substantial damage to Jetlines, as Defendants intended.

57. Among other things, by causing Johnson to conceal from Jetlines his dealings with them, Defendants caused Jetlines and the Bank to continue to rely on Johnson as the centerpiece of their efforts to procure new financing for Jetlines from mid-July through August, rather than formulating and pursuing a different strategy featuring a point person other than Johnson. Johnson's sudden, eleventh-hour betrayal of the confidence he caused Jetlines and the Bank to place in him, caused weeks of effort invested by Jetlines and the Bank to go to waste, irreparably damaged Jetlines' credibility with the Bank, caused the Bank to suspend and later terminate its engagement to assist with Jetlines' new financing, all of which substantially damaged Jetlines' reputation in the airline and financial industries.

58. Defendants' unlawful machinations damaged Jetlines by causing the cancellation of its lease of two Airbus A320 aircraft from AerCap to be delivered in March and April 2019 and Jetlines' resulting forfeiture of its USD $2.2 million deposit under that lease. This forced Jetlines to negotiate an alternative lease of two Airbus A320 aircraft from SmartLynx Airlines SIA for delivery in November 2019, and to delay its targeted launch of commercial service from June until December 2019.

59. Defendants' unlawful machinations further damaged Jetlines by delaying its ability to obtain new funding, obtain the requisite operating licenses in Canada, and commence flight operations and earn related revenues. Assuming a delay of seven (7) months, based on Jetlines' current operating plan, resulting lost revenues would equal or exceed the sum of USD $25 million.

60. Defendants' unlawful machinations further damaged Jetlines by reducing the projected amount of new funding available to it and damaging Jetlines' reputation and relationships, including with the Bank, in the airline industry and capital markets.

## FIRST CLAIM FOR RELIEF
## TORTIOUS INTERFERENCE WITH BUSINESS
## RELATIONSHIPS AND EXPECTANCIES

61. Plaintiffs reallege ¶¶ 1-60 above.

62. At all relevant times, Jetlines possessed valuable business relationships with Johnson and the Bank.

63. At all relevant times, Defendants knew of those relationships.

64. Defendants intentionally interfered with those relationships, knowing and intending that such interference would cause Jetlines actual loss. Such interference was tortious in that, among other things, it arose from Defendants' inducement of Johnson to breach his fiduciary and contractual duties of loyalty, candor and full attention to Jetlines.

65. Defendants' misconduct amounted to attempted assassination of Jetlines' business, rather than merely good business practice.

66. Jetlines suffered actual loss as a result of Defendants' interference with its relationships with Johnson and the Bank.

67. Defendants' misconduct reflected Plaintiffs' reckless indifference to the rights of Jetlines or an intentional and wanton violation of those rights.

## SECOND CLAIM FOR RELIEF
## VIOLATION OF CONNECTICUT UNFAIR TRADE PRACTICES ACT
## C.G.S.A § 42-110B

68. Plaintiffs reallege ¶¶ 1-67 above.

69. Defendants' misconduct as alleged above offends public policy.

70. Defendants' misconduct was immoral, unethical, oppressive and unscrupulous, and involved a conscious departure from known business norms.

71. Defendants' misconduct resulted in an ascertainable loss to Plaintiffs.

72. Defendants' misconduct arose from Plaintiffs' reckless indifference to the rights of

Jetlines and/or an intentional and wanton violation of those rights.

WHEREFORE, plaintiffs Canada Jetlines Ltd. and Canada Jetlines Operations Ltd. respectfully demand judgment against Defendants David Neeleman, DGN Corporation and Breeze Aviation Group, Inc., jointly and severally, as follows:

A.    On its First and Second Claims for Relief, awarding Plaintiffs compensatory damages in an amount to be proven at trial, but reasonably estimated at this time to equal or exceed the sum of USD $27 million plus applicable interest;

B.    On its First and Second Claims for Relief, awarding Plaintiffs punitive damages in an amount to be determined at trial;

C.    Awarding Plaintiffs their costs and reasonable attorneys' fees;

D.    Awarding Plaintiffs such other and further relief as the Court deems proper.

E.    Plaintiffs respectfully demand trial by jury of the claims alleged herein.

Dated: November 15, 2019
       New York, New York

    WINSLETT STUDNICKY McCORMICK & BOMSER LLP

    By   s/David L. Barrack
        David L. Barrack (Bar No. CT10155)
    6 East 39th Street, Sixth Floor
    New York, New York 10016
    (646) 233-3016
    *dbarrack@wsmblaw.com*

    Of Counsel,
    James H. Neale
    Winslett Studnicky McCormick & Bomser LLP
    6 East 39th Street, Sixth Floor
    New York, New York 10016
    (646) 583-0765
    *jneale@wsmblaw.com*

(application for *pro hac vice* admission expected)